FILED - GR
February 7, 2014 4:26 PM
TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: mkc / SCANNED BY: /

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JILL SITES, ) | 1:14-cv-128 |
| ) | Paul L. Maloney, Chief Judge |
| Plaintiff, ) | United States District Court |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| GREENBUSH BREWING CO., ) | **COMPLAINT AND JURY** |
| SCOTT SULLIVAN, and JUSTIN ) | **DEMAND** |
| HECKATHORN, ) | |
| ) | |
| Defendants. ) | |

Plaintiff, Jill Sites ("Sites"), by and through her undersigned attorneys, for her Complaint against Greenbush Brewing Co. ("Greenbush"), Scott Sullivan ("Sullivan"), and Justin Heckathorn ("Heckathorn" and collectively with Greenbush and Sullivan "Defendants"), states as follows:

### INTRODUCTION

1. Greenbush is a successful craft brewery located in Sawyer, Michigan. Originally started by childhood friends Sullivan and Heckathorn, Greenbush began selling its beer to the public in 2011. By that time, Sites had joined Greenbush and become its "Ambassador of Everything," doing the work of an operations manager. In further recognition of the role Sites played in Greenbush's success and to incentivize Sites to continue in that role, Sullivan and Heckathorn made Sites a partner in April of 2012. As a result, from April 2012 until October 21, 2013, Sullivan, Heckathorn, and Sites each owned one third of the company's stock. After Sites joined Sullivan and Heckathorn as an owner, Greenbush's business continued to flourish and, by October 2013, Greenbush was very successful.

2. In late October 2013, while Sites was on an approved medical leave, Sullivan sent Sites an email on Friday, October 16, 2013 demanding that Sites come to the brewery for a

meeting the following Monday, October 21, 2013. Sites agreed to come in and met with Sullivan and Heckathorn the morning of the October 21, 2013. During that meeting, Sullivan and Heckathorn presented Sites with a Confidential Separation Agreement and Release (the "Separation Agreement") and demanded that she sign it or she would get nothing. A copy of the Separation Agreement is attached as Exhibit A.

3. Pressured by Sullivan and Heckathorn, including their denying her the opportunity to review the agreement with an attorney or her husband, or even fully read and consider it herself, and worried about their threat that she would get nothing at a time when she was dealing with worrisome and difficult to diagnose medical issues, Sites signed the agreement.

4. The Separation Agreement was intended to govern Sites separation from Greenbush and provided that her employment with Greenbush would terminate that day. The Separation Agreement also required Sites to return her Greenbush shares, without any further compensation or consideration.

5. The actions taken by Greenbush, Sullivan, and Heckathorn on October 21, 2013, constitute unlawful shareholder oppression against Sites and resulted in the unlawful conversion of her shares in Greenbush. Sites now brings this action to recover against Defendants for those unlawful actions.

**PARTIES**

6. Plaintiff Jill Sites is a Missouri citizen who resides in St. Louis, Missouri.

7. Defendant Greenbush Brewing Co. is a Michigan corporation with its principal place of business in Sawyer, Michigan.

8. Defendant Scott Sullivan is a Michigan citizen who resides in Bridgman, Michigan.

9. Defendant Justin Heckathorn is a Michigan citizen who resides in Grand Rapids, Michigan.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as Plaintiff is a citizen of a different state than Defendants and the amount in controversy exceeds seventy-five thousand dollars exclusive of interest and costs.

11. Venue is proper in this Court because the Defendants all reside in this venue and a substantial portion of the events giving rise to the claims asserted herein occurred in the venue.

## BACKGROUND FACTS

### A. Founding of Greenbush.

12. Sullivan and Heckathorn founded Greenbush in August of 2010. In founding Greenbush, they were looking to turn their interest in brewing and turn it into a business by creating a craft brewery.

13. Around the same time, Greenbush found a space in Sawyer, Michigan and began working to convert that space from a laundromat into a brewery and taproom.

### B. Sites Joins Greenbush.

14. Sullivan and Heckathorn knew Sites from, among other things, her work running a wine and craft beer shop in Three Oaks. One of the first times that Greenbush served its beer to the general public was at an event in Three Oaks, Michigan organized by Sites. The reaction to the beers Greenbush served at that event was very good, further encouraging Greenbush and its founders to pursue their new business.

15. Prior to her work in Three Oaks, Sites had worked in public relations, and so had experience in helping businesses market their products.

16. Knowing of Sites' background in public relations and her experience in the area, Sullivan and Heckathorn reached out to Sites to see if she might be interested in helping Greenbush with its public relations efforts.

17. Around this time, Sites had been considering leaving the Southwestern Michigan area and moving to Chicago. Sites even had a job offer for a position in Chicago and was considering accepting it.

18. When Sullivan learned this, he asked her not to take the job in Chicago and instead offered her a fulltime position at Greenbush.

19. Sites agreed to accept the position at Greenbush and joined fulltime in May of 2011.

20. When Sites joined Greenbush, her title was Brand Manager, but her duties were much more operational as Sites quickly became responsible for the day-to-day operations of the business. Sites's responsibilities and duties included, among other things, hiring the taproom employees, setting up of the point of sale system for the taproom, and ordering, designing, and selling Greenbush-branded merchandise. In addition, taking advantage of Sites's marketing background, Greenbush put Sites in charge of its marketing efforts, including handling Greenbush's social media outreach efforts on Facebook and Twitter.

C. **Greenbush Opens For Business.**

21. Greenbush opened its taproom in Sawyer in June of 2011.

22. From the start, Greenbush was a rousing success.

23. By the time the taproom opened, Greenbush's management structure had taken hold, with three people leading the company: Sullivan, Heckathorn, and Sites.

24. Sullivan was and is, as Greenbush's website describes it, the HMFiC or Head Mother F*cker in Charge. As HMFiC, Sullivan was and is primarily responsible for the

4

Greenbush concept and, working with the Greenbush brewers, the beer. Sullivan was at Greenbush almost every day, working on beers, food (once Greenbush started serving food), and being generally involved in the business.

25. Heckathorn is the Financial Operations Office, meaning he is in charge of the financial aspects of the business. Initially, Heckathorn also had a job outside of Greenbush, and so generally was not at the brewery every day. Although, that changed in June 2012 when he joined Greenbush fulltime, while Sites was at Greenbush, Heckathorn continued to work much of the time from his Grand Rapids home, coming into the brewery roughly two days a week.

26. Sites, as the Ambassador of Everything acted as Greenbush's operations manager, overseeing the day-to-day operations of the business and ultimately being responsible for the daily details involved in the operation of the brewery and taproom.

27. After the opening of the taproom, Greenbush thrived. As Sullivan recently boasted, by September 2013, Greenbush's production had tripled from its founding. As a result, every square foot of the brewery and taproom has been "maxed out" and Greenbush began planning to expand its brewing capabilities by adding another brewing facility near the taproom.

**D.     Greenbush Ownership.**

28. Greenbush was set up as a Michigan corporation.

29. Upon information and belief, initially Sullivan and Heckathorn were the only shareholders, with each owning 50%.

30. In April 2012, after nine or so very successful months in operation, Sullivan and Heckathorn recognized Sites's role in Greenbush's success by making her an owner of Greenbush.

31. As a result, Sullivan, Heckathorn, and Sites each became a one-third owner of Greenbush, with each owning 1,675 shares of the company, in April 2012.

32. At the same time, Sites's salary was adjusted so that she was now paid the same salary as Sullivan and Heckathorn.

33. From this point on, until October 2013, Sullivan, Heckathorn, and Sites all operated Greenbush as partners.

34. Greenbush's success favorably impacted the value of the company. In the Spring of 2013, the company was valued at $1,666 per share, for a total value of over $8 million.

E. **Greenbush's Growing Pains and Sites's Medical Leave.**

35. While Greenbush is a fabulous success, that success came as a result of hard work and sacrifice, which took a toll on all involved.

36. After the 2013 Michigan Beer Festival, Sullivan and Sites discussed whether it made sense for Sites to be bought out of the company. Ultimately, no resolution was reached and Greenbush continued to be operated as it had, with Sullivan, Heckathorn, and Sites continuing in their existing roles.

37. During 2013, Sites experienced a number of medical issues. On August 26, 2013, these issues resulted in incredible pain that required Sites be hospitalized. Over the course of the following weeks, Sites continued to experience significant pain, the source and cause of which doctors were unable to pinpoint despite multiple appointments and hospitalizations.

38. As a result, Sites went on medical leave from Greenbush, leaving her role as Operations Manager. This leave began in early September, when Sites was unable to attend a beer fest in the Upper Peninsula due to pain, and was approved by Sullivan and Heckathorn on September 7, 2013.

39. While on medical leave, Sites remained in contact with Sullivan and Heckathorn. Sites's husband sent nearly daily emails and text messages to Sullivan and Heckathorn with

updates on Sites's health. Additionally, Sites from time to time asked Sullivan and/or Heckathorn for updates on Greenbush's business.

40. Though Sites believed she was entitled to these updates as a shareholder, she often received no response from Sullivan and Heckathorn, her fellow shareholders.

F. **Sullivan and Heckathorn Force Sites Out.**

41. On October 16, 2013, Sites received a message from Sullivan saying it was "high time" she came into the brewery and requesting a meeting on October 18, 2013. As Sullivan explained in that message, even though Sites was on medical leave, Sullivan thought it was time that they could talk about her role in the company.

42. Because of medical tests, Sites could not meet on October 18, 2013, but even though she was still dealing with serious medical issues, Sites agreed to come in and meet with Sullivan and Heckathorn on October 21, 2013. Going into that meeting, Sites expected to have a conversation with her fellow owners about the future of Greenbush and the roles that everyone might play in that future.

43. At the time of the meeting, Sites was on pain medication prescribed to her to help manage the pain she was experiencing.

44. When Sites arrived at Greenbush, she found an ambush waiting for her. After brusquely asking how Sites was, Sullivan launched the attack by declaring to Sites that she was not happy and neither were Sullivan and Heckathorn.

45. Sullivan then listed a series of problems that he believed existed with Sites. Sites did not understand most of the problems that Sullivan identified, and did not agree with those that she did understand. Sullivan even stated that he had been ready to "let [Sites] go" at the beer festival in the Upper Peninsula in early September that Sites was unable to attend due to her medical condition.

7

46. Eventually, Sites asked Sullivan what the endgame was. Sullivan responded that the endgame was that they all part ways, and do so right then.

47. Heckathorn, who had been present throughout the meeting but had yet to say anything, simply looked at the ground when Sullivan declared that it was time to part ways. After Sullivan prompted him, Heckathorn agreed with Sullivan.

48. Sullivan and Heckathorn then presented Sites with the Confidential Separation Agreement and Release.

49. In presenting the agreement, Sullivan told Sites that she had to sign it right then or she would get nothing.

50. Sites responded that she needed time to review the Separation Agreement with an attorney and, at a minimum, discuss it with her husband.

51. Sullivan told Sites no, she had to sign it right then.

52. Sites then asked for time to at least read the Separation Agreement herself before signing it.

53. Again, Sullivan refused the request, this time telling Sites that she needed to sign the document and then she would be given a copy she could take with her and read then.

54. Pressured to sign by the two people who had been her partners in Greenbush and worried that if she did not sign she might not be able to afford to continue the medical treatment she was receiving while on an approved medical leave (including the pain medication she was on even at that meeting), Sites had no choice but to accede to Sullivan's demands and sign the Separation Agreement.

   **G.**  **The Separation Agreement.**

55. The Separation Agreement includes provisions related to the termination of Sites's employment at Greenbush. (*See, e.g.*, Separation Agreement, ¶¶ 1.1-1.2, 2.1, 3.1.)

Pursuant to these provisions, Sites's employment with Greenbush ended on October 21, 2013. In exchange for providing a release for claims related to her employment, Sites received severance benefits including severance pay and health insurance. The Separation Agreement also provided for Sites to return any company property in her possession.

56. Both Greenbush and Sites have complied with the portions of the Separation Agreement related to the termination of Sites's employment.

57. The Separation Agreement, however, also included a provision requiring Sites to "immediately sign over all shares in" Greenbush that Sites owned.

58. The Separation Agreement includes no compensation or other consideration related to the requirement that Sites sign over her shares of Greenbush stock.

## COUNT I
### SHAREHOLDER OPPRESSION IN VIOLATION OF MCL 450.1489

59. Sites restates and incorporates by reference paragraphs 1 through 58 as though the same were fully set forth herein.

60. Sullivan and Heckathorn, through their ownership of two-thirds of the shares of Greenbush, are in control of Greenbush.

61. By forcing Sites to sign the Separation Agreement, which included a provision requiring Sites to turn over her Greenbush shares, through willfully unfair and oppressive conduct that denied her the opportunity to read, let alone fully consider, the Separation Agreement, Sullivan and Heckathorn violated MCL 450.1489 and acted illegally and took Sites's shares without compensation.

62. Defendants' actions harmed Sites by taking her Greenbush shares without compensation.

## COUNT II
## DECLARATORY JUDGMENT

63. Sites restates and incorporates by reference paragraphs 1 through 62 as though the same were fully set forth herein.

64. The Separation Agreement principally provides terms governing the termination of Sites' employment at Greenbush. Those terms include terms governing her return of Greenbush property, a release in favor of Greenbush of any claims arising out of Sites' employment, and the benefits that would be paid to Sites in exchange for the release.

65. The Separation Agreement also includes a provision, Section 1.3, requiring Sites to "immediately sign over all shares" in Greenbush transferred or held by her.

66. No consideration is provided for the signing over of the Greenbush shares.

67. Sullivan and Heckathorn, through their willfully unfair and oppressive conduct, unlawfully forced Sites to sign the Separation Agreement even though it included the provision regarding the signing over of her Greenbush shares.

68. The parties dispute the enforceability of Section 1.3, requiring Sites to sign over her Greenbush shares.

69. An actual controversy exists between Sites and Defendants by virtue of their conflicting positions regarding the enforceability of Section 1.3 of the Separation Agreement.

## COUNT III
## CONVERSION IN VIOLATION OF MCL 600.2919a

70. Sites restates and incorporates by reference paragraphs 1 through 69 as though the same were fully set forth herein.

71. By forcing Sites to sign the Separation Agreement, which included a provision requiring Sites to turn over her Greenbush shares without compensation for the shares, Defendants exercised dominion over Sites's property, thereby converting it for their own use.

72. Defendants' actions harmed Sites by depriving her of her shares in Greenbush.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jill Sites prays that the Court enter judgment in her favor and against Defendants Greenbush Brewing Co., Scott Sullivan, and Justin Heckathorn and enter an order:

(a) Requiring Defendants to purchase Sites's Grenbush shares at fair value as of October 21, 2013 or an award of damages equal to the fair value of Sites's Greenbush shares as of October 21, 2013;

(b) Declaring Section 1.3 of the Separation Agreement invalid;

(c) Trebled damages for the harms Sites suffered as a result of Defendants' violations of MCL 600.2919a;

(d) Costs and attorneys' fees Sites incurred as a result of Defendants' violations of MCL 600.2919a; and

(e) Such further and additional relief to which Sites may be entitled to at law or in equity.

Dated: February __7__, 2014

SILVER & VAN ESSEN, P.C.
Local Counsel for Plaintiff

By:_____
Lee T. Silver (P-36905)
ltsilver@silvervanessen.com

BUSINESS ADDRESS & TELEPHONE:
300 Ottawa Avenue N.W. – Suite 620
Grand Rapids, MI  49503
(616) 988-5600

11

>Max A. Stein (IL ARDC No. 6275993)
>Boodell & Domanskis, LLC
>353 North Clark Street, Suite 1800
>Chicago, Illinois 60654
>Telephone: (312) 938-4070
>Fax: (312) 540-1162 (facsimile)
>mstein@boodlaw.com

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable to a jury.

>SILVER & VAN ESSEN, P.C.
>Local Counsel for Plaintiff

Dated: February 7, 2014

By: _____
Lee T. Silver (P-36905)
ltsilver@silvervanessen.com

>BUSINESS ADDRESS & TELEPHONE:
>300 Ottawa Avenue N.W. – Suite 620
>Grand Rapids, MI 49503
>(616) 988-5600

>Max A. Stein (IL ARDC No. 6275993)
>Boodell & Domanskis, LLC
>353 North Clark Street, Suite 1800
>Chicago, Illinois 60654
>Telephone: (312) 938-4070
>Fax: (312) 540-1162 (facsimile)
>mstein@boodlaw.com